## Case No. 10,767.

PARMLEY v. ST. LOUIS, I. M. & S. R. CO. PAUL v. PACIFIC R. CO. BAILEY v. ATLANTIC & P. R. CO. ST. JOHN v. MISSOURI, K. & T. RY. CO. COURTRIGHT v. CLARK et al.

[3 Dill. 13.]¹

Circuit Court, E. D. Missouri. 1874.

RESTRAINING COLLECTION OF TAXES.

1. The nature and extent of the jurisdiction in equity to restrain the collection of taxes, considered.

[Cited in Paul v. Pacific R. Co., Case No. 10,-845.]

[See Bailey v. Atlantic & P. R. Co., Case No. 732.]

2. Facts stated, which, if proved, would authorize a partial restraint of taxes, because of the illegal action of the state board of equalization.

[These were bills in equity by Duncan S. Parmley against St. Louis, Iron Mountain & Southern Railroad Company, Amos Paul against Pacific Railroad Company, Ozias Bailey against Atlantic & Pacific Railroad Company, Frederick St. John against Missouri, Kansas & Texas Railway Company, and Milton Courtright against Clark, state auditor, and others.] These are separate suits by non-resident stockholders in the several railroad companies above mentioned, brought against the directors of those companies and against the state auditor and the officers of the several counties and municipalities through which the respective roads run, to restrain the collection of taxes levied under the legislation of the state, for the year 1873. The bills, in their frame and theory, are like that which was considered and supported by the supreme court of the United States in Dodge v. Woolsey, 18 How. [59 U. S.] 351. Special grounds of relief, total or partial, in addition to the general one noticed in the following opinion, are set forth in the bills. The cases came before the circuit judge, at his chambers, August 5, 1874, upon motions by the respective plaintiffs for the allowance of temporary injunctions. No answers were filed, and the question argued was whether the bills, upon their face, and supposing their allegations to be true, made out a prima facie case for a preliminary injunction.

Mr. Dryden, Mr. Baker, Mr. Lytton, Mr. Low, Mr. Drury. and Mr. Waters, for plaintiffs.

Mr. Ewing, State Atty. Gen., and Mr. Clover, for defendants.

DILLON, Circuit Judge. Non-resident stockholders in the St. Louis, Iron Mountain &

¹ [Reported by Hon. John F. Dillon, Circuit Judge, and here reprinted by permission.]

Southern Railroad Company, in the Pacific Railroad Company, in the Atlantic & Pacific Railroad Company, in the Missouri, Kansas & Texas Railway Company, and in the Chicago & Southwestern Railway Company, corporations chartered or organized and operating their roads under the laws of the state of Missouri, have filed in the circuit courts for the Eastern and Western districts of the state, bills in equity for relief against alleged illegal and excessive taxation under the authority of the state, and praying for the allowance of temporary injunctions to stay the collection of the taxes until the merits of the respective complaints can be heard.

Special grounds of relief are set forth in several of the bills not common to all the cases; such, for example, as the alleged erroneous assessments to the Pacific Railroad Company, and to the Missouri, Kansas & Texas Railway Company, of cars exclusively belonging to the Pullman Company; and to the Chicago & Southwestern Railway Company, of rolling stock of several hundred thousand dollars in value owned by the Chicago, Rock Island & Pacific Railroad Company. And again, the Pacific Railroad Company and the Atlantic & Pacific Railroad Company claim exemption, total or partial, from the taxes of 1873, by virtue of an alleged contract to that effect with the state, contained in the twelfth section of the act of December 25, 1852, relating to these lines of road.

There is, however, a common ground of complaint in all the bills in respect to the action of the state board of equalization in fixing the valuation of the property of the respective companies for taxation. It is to this feature of the cases that I will now advert, omitting in this place reference to the grounds of relief peculiar to several of the cases.

In 1873 the legislature of Missouri passed an act specially providing for the assessment of railroad property, and the mode of collection of taxes thereon. Laws 1873, p. 63. The act was in some respects modified in 1874. Laws 1874, p. 130. By this legislation each railroad company in the state is required to make a statement, on oath, of its length of road and all its taxable property within the state, "and the actual cash value thereof." This statement is to be furnished to the state auditor, and a similar statement to the clerk of the county court of each county through which the road runs. The county court of each county is required to examine this statement and determine the correctness of the same as to description of property and valuation thereof. If correct, they so certify it to the state auditor. If property is omitted, they add it. And then, as to all property, they are required to forward to the state auditor "an official statement of what they believe to be the actual cash value." The auditor lays these statements received from the companies and from all the county courts before the

state board of equalization, which meets in January of each year.

The state board of equalization is composed of "the members of the state senate and the lieutenant governor for the time being," of which "the lieutenant governor is ex officio president," a majority of whom shall constitute a quorum, "and each member is required to take an oath as a member of the board." Laws 1872, p. 86. As respects railroad property, the board are required, when they meet annually, "to proceed to adjust and equalize the aggregate valuation of the property of each railroad company." It is also provided that "the board shall have the power to summon witnesses, and to compel their attendance; to increase or reduce the aggregate valuation of the property of any railroad company included in the aforesaid statements or returns, and any other property belonging to the said railroad companies which may be otherwise known to them, as they shall see just and right." The board is required to apportion lands and buildings to the counties and towns in which such property is situate, and all the other property is to be apportioned to each county, town, etc., according to the ratio which the number of miles of road therein bears to the whole length of the road. It is upon the value thus determined that taxes are levied, the state taxes to be charged to the companies by the auditor, the county and other local taxes to be levied locally upon the valuation thus settled by the state board of equalization. The state taxes, as well as county taxes, are collected by the county authorities; the municipal taxes by the municipality.

It thus appears that the valuation of railroad property upon which all taxes, state and local, are levied, is determined by the state board of equalization, and all the powers and duties of this board are substantially set forth above.

The bills charge misconduct and illegal action on the part of the board in many particulars. It will suffice to refer to the statement of the more material of them in the case relating to the Iron Mountain Company. The bill sets forth that the board assessed the property of that company "at a sum more than three fold its cash value," and that in doing so they were not governed by any evidence adduced before them of values, nor by any knowledge they possessed of values, but were in fact moved and influenced by passion and prejudice against the company; that, though they were the same body substantially as fixed the value of the same property for the year 1872 at the total sum of $2,111,435, yet for 1873 (the year now in question) they raised it three fold, or to the sum of $6,266,334; that in 1872 they fixed the value of the road bed at $5,000 per mile, whilst in 1873 they fixed the same at $14,900 per mile; that the board, consisting of thirty-five members, referred the matter of the values of the company's property to a committee of five, which,

it is charged. they could not legally do; that the board, by rule, debarred the company from presenting evidence before the board, but compelled the company to appear before the committee of five to present its evidence to them, or not at all. It is directly charged that the board adopted rules which expressly debarred the company from being heard by the board on appeal from the action of the committee. It is also charged that although the board adopted a rule that the substance of the testimony of each witness should be taken down by the committee, and signed by the deponent, and be reported to the board by the committee, yet it is alleged that in many instances the evidence was not taken down, and "that not a single statement which was reduced to writing was reported to the board, nor was there ever any report to the board of any evidence before the committee, or even of the facts which the committee believed to have been established by the evidence."

It is stated that the committee of the board valued the road bed at $7,875 per mile, which the plaintiff alleges was in excess of the actual cash value, "yet the board, without any evidence whatever, and without any knowledge whatever in themselves of values, increased the committee's estimate to the enormous sum of $14,900 per mile," and this without any report from the committee of the testimony or the facts proved before them, and against the voice of the members of the committee, with one exception.

The bill also charges that the board, in violation of the constitutional provision requiring equal taxation in proportion to value, and intending to discriminate against railroad property, "knowingly and intentionally required such property to pay one-third more taxes in proportion to its value than other property of equal value. It is also charged that the state board exceeded its lawful powers by undertaking to make, and making, a new and original assessment, instead of confining themselves to the duty of equalizing assessments.

In the case of the Pacific Railroad, it is alleged that the board in like manner increased the aggregate value from $3,716,920, as returned by the company, to $9,654,423, and fixed the value of the road per mile at $26,000.

The board in like manner, it is charged, increased the taxable valuation of the Atlantic & Pacific Company's property from $2,308,504 to $6,215,503, and fixed the value of its road per mile at $10,000; the property of the Missouri, Kansas & Texas Company was increased by the board from $1,801,688, as valued by the company, or $3,481,246, as valued by the county court, to $5,698,950, and fixed the value of the road per mile at $18,000; the valuation of the Chicago & Southwestern Railway Company was increased from $650,000 to $1,849,339. Other complaints in the bill are made against the board of a minor character, such as the failure of an active member to take the oath of office; and intentionally assessing as the company's, property which did not belong to them.

Such are the grievances complained of; and the question now is whether, if the allegations of the bills are substantially true, they give a right in equity to relief, and to what extent. The cases are now before me, after notice to the defendants, for an allowance of a temporary injunction. No answers have been filed, and hence the material allegations of the bill, which are sworn to, are, on this hearing, and for the present purpose, to be considered as true, and the inquiry is, supposing the bills to be true, can a court of equity interfere, either preliminarily, by an injunction, or finally, by a decree?

The decisions as to what will give an equity to enjoin the collection of taxes are conflicting, and, to my mind, not very satisfactory. Since all regular governments subsist by means of taxes, which are assessed, levied, and collected under laws necessarily stringent and summary, in order to insure prompt payment, it is obvious that the courts should not interfere, by injunction, with the regular working of these laws, unless an injury to the citizen will be thereby inflicted, for which he has no other adequate remedy. When this is the case, however, the courts should not hesitate to interfere to protect the citizen against the action of the state; for the state, acting for all, is under the highest obligation to deal justly with each.

I confess to some doubts as to what will warrant the judicial tribunals in interfering with the results of the action of such a body as the state board of equalization. It is clear that such interference cannot be justified for reasons merely formal or technical, or for acts which do no substantial injury, or where the wrong could have been avoided or prevented by measures or steps open to the party at the time. Mistakes of judgment on the part of such a body in honestly over-valuing property cannot ordinarily, if ever, be corrected by a bill in equity.

On the other hand, I am unwilling, without further reflection, to say that in no possible case will a court of equity interfere with the result of the action of an assessing or equalizing body. Suppose local assessors purposely value the property of non-residents two or three times as high as the property of residents, and that this action is confirmed by the local board of equalization, which refuses to interfere because in sympathy with the feelings which actuated the assessors, is there no remedy? Now, if the charges in the present bill be true, the state board, actuated by passion and prejudice, and with a design to discriminate against railroads, and without evidence, have assessed the property not only higher than it was valued by the companies, on oath, but higher than it was valued by the county courts, and much higher than it was valued upon evidence by committees of their own

body, the result of which is, as alleged, an excessive valuation of at least one-third more than other property of equal value, thereby compelling the railroads to bear more than their share of the public burdens. If all this can be established, my impression is that equity ought to intervene—not, however, to annul the whole assessment, but only to reduce the inequality. So if the board should clearly exceed its lawful jurisdiction, there might be a remedy by injunction in a proper case. In stating that such are my impressions, I wish to add that they are not firm convictions, and that on questions of so much difficulty and importance, it is but just to both sides that any final views should be reserved until they can be brought upon full argument before the whole court. It is a fortunate circumstance that the court meets next month, and that these cases can be heard before all the judges, and perhaps a decision then had, or, at all events, the principles of decision settled, so as to involve no great delay in the collection of these taxes to the extent of the actual value of the property, except those roads, if there be any, which have a still subsisting legislative contract of exemption from taxation.

In order to bring this matter before a full court, and to give the defendants an opportunity to answer the charges in the bills, if they so desire, I have thought it best to allow temporary injunctions to issue, unless the defendants are willing to let the collection of the taxes rest until the views of the court can be had. We will give every facility for bringing the question to a speedy hearing, and the counties, etc., can at any time, if this is deemed desirable by them, have the injunctions modified so as to allow them to collect taxes so far as the admitted value of the property shows a liability, or so far as we see it to be equitable; or we can refuse to continue the injunction, except on condition that such a portion of the taxes be paid into court for the use of the state, counties, and towns entitled thereto. At present, and until the views of the court are settled concerning the right to maintain these bills, it is, perhaps, best not to complicate the cases by requiring payment of a proportion of the assessed taxes as a condition of the injunction. Inasmuch as there exist doubts as to the right to maintain these bills, and in view of the fact that the time is only a few weeks distant, it would seem best on all sides to let the matter rest until the court meets, without requiring injunctions to be formally issued, which will be attended with costs; but if the defendants are unwilling to allow this to be done, a temporary injunction may issue in each case, reserving the right of the defendants to move at the next term to dissolve it, with or without answer, as they may be advised. If answers are to be filed to resist the injunctions, let this be done by the September rules, and any affidavits in support thereof by September 15th, and counter-affidavits by September 25th. Motions to dissolve or modify the injunctions may be set down for the second Tuesday of the term. Ordered accordingly.

[NOTE. A temporary injunction was granted the plaintiffs. Case No. 732. The exemption from taxation claimed by the company was held not to exist. Id. 10,768. Upon the final hearing the injunctions were modified so as to permit the collection of the tax to an amount not in excess of that fixed by the various county courts through which the roads run. Id. 10,-845.]

As to enjoining taxes. see First Nat. Bank v. County of Douglas [Case No. 4.799]; Union Pac. R. Co. v. McShane [Id. 14.382]; Hunnewell v. Burlington & M. R. R. Co. [Id. 6,879]; Oliver v. Omaha [Id. 10,499.]